UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FISCHER & FRICHTEL CUSTOM HOMES, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )   Case No. 4:21-cv-00470-MTS |
| FISCHER MANAGEMENT, LLC, et al., | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order, Doc. [4]. After reviewing the Complaint, Doc. [1], considering the instant Motion and all related papers and exhibits,[1] and hearing oral argument on the issues, the Court finds that Plaintiff has not demonstrated that this case warrants the extraordinary remedy of a temporary restraining order.

**I.     BACKGROUND**[2]

Plaintiff Fischer & Frichtel Custom Homes, LLC provides homebuilding services in the St. Louis region. Founded in 1945, Plaintiff is now the fourth-largest builder in the St. Louis area. It has used the "Fischer & Frichtel"[3] name—the surnames of its founding members—continuously since its inception. Defendant Fischer Homes,[4] like Plaintiff, is a family-owned homebuilding

---

[1] This includes the documents attached to Plaintiff's Motion for Leave to Supplement Exhibits, Doc. [27], filed on May 3, 2021.

[2] The Court draws these facts from the Complaint, Doc. [1], Plaintiff's Motion for TRO and its affiliated documents, Doc. [4], Defendant's Memorandum in Opposition to Plaintiff's Motion for TRO, Doc. [14-1], and the hearing the Court held on the Motion for TRO.

[3] Plaintiff also has used the abbreviation "f&f" as shorthand for its name.

[4] For ease, the Court will refer to Defendants in the singular, since the two named Defendants appear to be the same entity for purposes of this case.

1

company.  It, too, bears the surname of its founders, and appears to have used the name "Fischer Homes" since its founding in 1980.  Defendant initially built homes in the northern Kentucky area, but it has since expanded into southern and central Ohio, Indianapolis, Atlanta, and Louisville.  Defendant has recently been ranked in the top thirty homebuilding companies nationally.

The genesis of the instant dispute is Defendant's agreement to purchase Payne Family Homes, a St. Louis-based homebuilding company founded in 2007.  It appears that Defendant announced the agreement on April 1, 2021, with the agreement scheduled to be completed on May 1, 2021.  Doc. [1-6].  Defendant has not previously built homes or otherwise marketed in the St. Louis area.  Understandably concerned about Defendant's entrance into the St. Louis market, Plaintiff reached out to Defendant regarding the similarity of their company names.  *See* Doc. [1-8].  In response, Defendant's Chairman, Greg Fischer, wrote to Plaintiff that though Defendant did not believe its operation in St. Louis would confuse consumers, it was willing to put a disclaimer on any press releases stating that "Fischer Homes is not affiliated with f&f."  *Id.*  Defendant further agreed to "continue to use its marketing and advertising styles currently in place . . . and to specifically avoid the blue, all lowercase design choices" used by Plaintiff in its logo.  *Id.*  For reference, the parties' current logos are below (Plaintiff's on the left and Defendant's on the right).

   

Finally, Defendant also said it would "work cooperatively and in good faith to limit any confusion that may arise," designating its director of marketing as a "primary contact to which such issues [could] be raised." *Id.*

On April 8, 2021, Plaintiff asked Defendant to stop marketing its homebuilding services in

2

St. Louis using the "Fischer Homes" name, which Defendant declined to do.  Arguing that Defendant's use of its name "Fischer Homes" violates Plaintiff's unregistered trademarks, Plaintiff brought this action, making claims of trademark infringement and unfair competition under the Lanham Act as well as unfair competition and trademark dilution under Missouri law.  Doc. [1] ¶¶ 23–39.  Plaintiff also requested that the Court enter a temporary restraining order prohibiting Defendant from, among other things, using "Fischer," "Fischer Homes," or any other name "that is confusingly similar" to Plaintiff's alleged trademarks in its marketing or homebuilding services in St. Louis.  Doc. [4] at 1.

## II.  LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER

"A temporary restraining order is an extraordinary and drastic remedy." *King v. Blake*, No. 4:08-cv-1050-RWS, 2009 WL 73678, at *1 (E.D. Mo. Jan. 9, 2009).  The party seeking injunctive relief bears the burden of establishing the necessity of such relief.  *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *Morningside Church, Inc. v. Rutledge*, 471 F. Supp. 3d 921, 924 (W.D. Mo. 2020).  In deciding whether to issue a temporary restraining order (TRO), the Court must consider the following four factors: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the harm that granting the injunction will inflict on other parties; (3) the probability that the movant will prevail on the merits; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *City of Berkeley v. Ferguson-Florissant Sch. Dist.*, No. 4:19-cv-168-RLW, 2019 WL 1558487, at *2 (E.D. Mo. Apr. 10, 2019).  "While 'no single factor is determinative,' the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113 (internal citations omitted)).  The Court will therefore begin its analysis there.

**III.   DISCUSSION**

    **A. Likelihood of Success on the Merits**

Because Plaintiff needs to demonstrate likelihood of success on only one of its claims, see *Sensient Techs. Corp. v. SensoryFlavors, Inc.*, No. 4:08-cv-003360-ERW, 2008 WL 762092, at *3 (E.D. Mo. Mar. 21, 2008), the Court will assess each of its claims. For the reasons that follow, the Court finds that Plaintiff is not likely to prevail on any of its claims.

    *1. Lanham Act and Missouri Trademark Infringement and Unfair Competition*

The elements of claims for trademark infringement and unfair competition under Missouri law "substantially overlap" with those of federal trademark law under the Lanham Act.[5] *See Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 991 (E.D. Mo. 2004). For that reason, the Court will assess the likelihood of Plaintiff's success on its federal- and state-law infringement and unfair competition claims together. *See Window World Int'l v. O'Toole*, No. 4:19-cv-2363-SEP, 2020 WL 7041814, at *4 (E.D. Mo. Nov. 30, 2020) (analyzing trademark infringement and unfair competition under the Lanham Act together with the same claims under Missouri law because the "claims stand or fall together"); *Sensient Techs.*, 2008 WL 762092, at *3–5 (assessing simultaneously trademark infringement and unfair competition under the Lanham Act along with Missouri claims of the same). To succeed on a claim for infringement of a trade name[6] or trademark, a plaintiff must show both (1) "that it has a valid, protectible trademark" and (2) "that there is a likelihood of confusion between its mark and the defendant's mark." *B & B Hardware,*

---

[5] Plaintiff appears to agree with this point. *See* Doc. [4-1] at 11.

[6] Plaintiff's counsel made clear at the hearing on the TRO that it wants the Court to prevent Defendant from using "Fischer" in effectively any capacity related to its homebuilding business in St. Louis. Since Plaintiff seeks protection of its company name—"Fischer" or "Fischer & Frichtel"—this case appears best classified as one involving a trade *name* rather than a trademark. *See* 1 McCarthy on Trademarks and Unfair Competition § 9:1 (5th ed.) ("Protection against the confusing use of the names of corporate . . . organizations is created by the law of 'trade names.'"). This distinction makes no difference for the Court's analysis here. *See id.* ("[T]he validity of a trade name is determined by the same rules of distinctiveness as in mainstream trademark law.").

*Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009).  The Court will address each of those requirements in turn.

    i.   Protectability of Marks

Plaintiff argues that Defendant's use of the name "Fischer" infringes each of Plaintiff's marks of "Fischer" and "Fischer & Frichtel."  *See* Doc. [4-1] at 3–4.  As such, to show it is likely to succeed on its infringement and unfair competition claims, Plaintiff must show that each of those marks—"Fischer," on the one hand, and "Fischer & Frichtel," on the other—is protectible.  Both marks consist only of surnames, and as such they are classified as descriptive marks requiring secondary meaning for protection under trademark law.  *JDR Indus. v. McDowell*, 1221 F. Supp. 3d 872, 885 (D. Neb. 2015) ("[T]he general rules is that surnames, when used as trademarks, are inherently indistinctive, and are permitted trademark protection only upon a showing that they have acquired distinctiveness through secondary meaning."); 2 McCarthy on Trademarks and Unfair Competition § 13:2 (5th ed.) ("Personal names are placed by the common law into that category of noninherently distinctive terms which require proof of secondary meaning for protection."); *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018) (explaining that "the trademark statute provides that words that are primarily merely a surname can be registered as trademarks if they have acquired secondary meaning").

"Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product."  *JDR Indus.*, 121 F. Supp. 3d at 885; *see also Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 882 (8th Cir. 2014) (noting that the "chief inquiry" when assessing whether a mark has acquired secondary meaning "is whether in the consumer's mind the mark has become associated with a particular source" (quoting *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985))).  Plaintiff

5

can show that its marks have acquired secondary meaning via direct evidence, like consumer testimony or surveys, or circumstantial evidence, including the length and exclusivity of the mark's use, the amount and manner of advertising, the amount of sales and number of customers, Plaintiff's established place in the market, or the existence of intentional copying. *Frosty Treats Inc. v. Sony Comput. Ent. Am. Inc.*, 426 F.3d 1001, 1005–06 (8th Cir. 2005).

Weighing these factors, the Court finds it unlikely that Plaintiff will show its use of "Fischer" alone has acquired secondary meaning. The Court puts heavy weight on the lack of evidence before it that Plaintiff has consistently or exclusively used the "Fischer" mark. Plaintiff did provide some evidence of the "Fischer" mark's recent use, but none of that evidence suggests Plaintiff has been using the abbreviated version of its name, omitting "Frichtel," long enough to create the type of association between service and source necessary to establish secondary meaning. For example, Plaintiff provided a handful of its own press releases wherein it refers to itself as "Fischer," see Doc. [1-2] at 3–5, but those press releases are only from 2016 and 2017 and, as documents published by Plaintiff, do not provide evidence of consumers' perception of the "Fischer" name. Plaintiff also provided undated advertisements referring to Plaintiff, in part, as "Fischer," see *id.* at 8–14, but the lack of date deprives the Court of the ability to measure the length of time Plaintiff has used "Fischer." The evidence before the Court suggests Plaintiff has used the "Fischer" mark only occasionally and has only recently started referring to *itself* as "Fischer." *See JDR Indus.*, 121 F. Supp. 3d at 886 (observing that a trademark user establishes secondary meaning "through long and exclusive use in the sale of the user's goods"). The several homeowner surveys Plaintiff provided bolster this conclusion. *See* Doc. [1-5]. Having reviewed those surveys, the Court counts only a single customer who referred to Plaintiff as "Fischer" as opposed to "Fischer & Frichtel" or "F&F." *See id.* at 92–93. Plaintiff has not provided any

6

evidence demonstrating that the "Fischer" mark has acquired secondary meaning through long and continuous use; it is therefore not likely that it will succeed on its infringement and unfair competition claims with respect to that mark.[7]

The "Fischer & Frichtel" trade name presents a different story.  The evidence Plaintiff has provided indicates that Plaintiff has used the "Fischer & Frichtel" name since its creation in 1945, see Doc. [1-1], and that its reputation plays a significant role in building relationships with customers, see Doc. [1-5].  The Court views this evidence as sufficient for present purposes to show that Plaintiff is likely to establish that "Fischer & Frichtel" has acquired secondary meaning and is thus a protectible trademark.  Having said that, as discussed below the Court finds that Plaintiff has provided insufficient evidence to show likelihood of confusion of its "Fischer & Frichtel" trade name.

ii.  Likelihood of Confusion

In analyzing whether an allegedly infringing mark is likely to cause confusion, the Court is guided by the non-exhaustive *SquirtCo* factors: (1) the strength of the mark, (2) the similarity of the plaintiff's and defendant's marks, (3) the degree of competition between the products, (4) the alleged infringer's intent to "pass off" its goods as the trademark owner's, (5) evidence of actual confusion, and (6) the type of product, its cost, and conditions of purchase (in other words, the sophistication of the likely consumer).  *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980); *Everest Cap. Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759 (8th Cir. 2005); *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005).  The Court is mindful that "no

---

[7] At the TRO hearing, Plaintiff's counsel referenced § 1212.05(a) of the Trademark Manual of Examining Procedure, which, for purposes of trademark registration with the U.S. Patent and Trademark Office, provides that "[f]or most surnames, the statement of five years' use will be sufficient to establish acquired distinctiveness."  But the evidence here does not support that Plaintiff has used "Fischer" consistently for five years, and in any case that Manual "does not have the force and effect of law."  *See West Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1127 n.8 (Fed. Cir. 1994).

7

one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." *Bumble Bee*, 398 F.3d at 1054.

On the evidence before it, the Court finds that the "similarity of marks" and "sophistication of consumer" factors necessarily dictate the outcome here. To begin with, the relevant consumers are those in the residential homebuying market. The Court must consider the marks' similarity consistent with the context in which consumers would encounter the marks and in consideration of "how carefully consumers are likely to scrutinize the marks." *Id.* And the services and products with which Plaintiff's marks are affiliated are likely to draw an immense amount of scrutiny. The purchase of a home is one the most significant, if not the most significant, purchases in many people's lives. *Cf. USA Visionary Concepts, LLC v. MR Int'l, LLC*, No. 4:09-cv-00874-DGK, 2009 WL 10672094, at *5 (W. D. Mo. Nov. 17, 2009) (providing a buyer of an automobile as an example of someone who can be expected to research the decision to purchase more carefully than a buyer of a pack of gum); *First Nat'l Bank in Sioux Falls v. First Nat'l Bank*, 153 F.3d 885, 889 (8th Cir. 1998) (observing that "consumers tend to exercise a relatively high degree of care in selecting banking services," so "customers are more likely to notice what . . . may be relatively minor differences in names"). Homes are quite expensive and are not the sort of thing a consumer is likely to purchase on a whim; they are perhaps one of the most obvious examples of the "general rule" that "the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *USA Visionary Concepts, LLC*, 2009 WL 10672094, at *5 (quoting *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001)). Rather than being a quick impulse buy, the purchase of a home is a drawn-out process that generally takes place over the course of some period of time.

8

As is particularly relevant here, consumers are likely to be working intimately with Plaintiff or Defendant throughout the homebuying or homebuilding process because of the nature of the parties' services.  The Court finds it immensely unlikely that a potential customer will not recognize fairly early in the process with which of the companies he or she is dealing.  The "sophistication of consumers" factor therefore weighs decidedly in Defendant's favor.  Given the balancing of factors in the likelihood-of-confusion inquiry, this finding means that a greater level of similarity between the relevant marks is required to show likely confusion.  *Cf. Bumble Bee*, 398 F.3d at 1054–55 ("[A] great level of dissimilarity is required because the products in this case are not priced or sold in a manner that suggests a high level of consumer sophistication.").  The Court finds that the marks—"Fischer & Frichtel" versus "Fischer Homes"—are not similar enough to overcome the probable deliberateness with which a consumer would approach selecting either Plaintiff or Defendant as a provider of homebuilding services.  The Court considers the marks as a whole, rather than picked apart as individual pieces.  *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987) ("[I]n analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features."); *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010).

Plaintiff's "Fischer & Frichtel" mark bears a rather significant distinction from Defendant's "Fischer Homes" mark: it contains the additional surname "Frichtel," which, if anything, is the *more* distinctive name between itself and "Fischer."  Simply because the marks both bear the name "Fischer" does not necessarily render them similar.  *Sensient Techs.*, 613 F.3d at 764 ("The use of identical, even dominant, words in common does not automatically mean that two marks are similar.").  On the evidence before it, the Court has little basis to hold that "Fischer" is the

dominant of the two names in Plaintiff's mark; instead, that evidence suggests that "Fischer" and "Frichtel" are intertwined in the minds of consumers, who consistently in Plaintiff's homeowner surveys referred to Plaintiff as "Fischer & Frichtel" or "F&F." Even if "Fischer" were the dominant of the two names, the Court still has to consider the mark as a whole, and doing so makes clear that "Fischer & Frichtel" is readily distinguishable from "Fischer Homes," especially to the sophisticated consumer here. *See Everest Cap. Ltd.*, 393 F.3d at 761 (noting that "[t]hough each mark uses the dominant word 'Everest,' that word is part of longer product names" in affirming finding of no likelihood of confusion). Whether a consumer encounters the marks in advertisements, in an article, in the parties' homebuilding communities, or by word of mouth, she would likely discern in short order which company she was dealing with in the course of the research that can normally be expected attendant to the purchase of a new home. The "similarity of marks" factor also weighs in Defendant's favor.[8]

The remaining *SquirtCo* factors do not save Plaintiff's argument. The strength of Plaintiff's mark is likely moderate. As a matter of *conceptual* strength, the "Fischer & Frichtel" mark is somewhere between weak and moderate. As discussed, surnames are considered descriptive marks that are lacking inherent distinctiveness, and the more distinctive a mark is, the more protection it is entitled to. *See Bumble Bee*, 398 F.3d at 1054. The law affords less trademark

---

[8] Plaintiff, for purposes of the TRO, focused its attention on the trade names "Fischer" and "Fischer & Frichtel," so the Court's analysis is necessarily directed to those terms. But the Court also finds that Plaintiff and Defendant's logos, displayed *supra* at 2, are dissimilar. Plaintiff's logo is blue, while Defendant's is red; the logos use different font styles, and Plaintiff's uses only lowercase letters, while Defendant's uses small caps; Plaintiff's logo contains the additional tagline "A Homebuilding Legacy Since 1945," while Defendant's contains no words other than "Fischer Homes;" Plaintiff's logo includes what appears to be a stylized figure meant to combine a capital letter "F" and the number "1," while Defendant's logo includes a cursive and stylized "FH" beneath its trade name; and finally, and most significantly, Plaintiff's logo includes its name "Fischer & Fritchel," while Defendant's includes its name, "Fischer Homes." These marks bear several obvious distinctions, even if the relevant consumers were unsophisticated. The Court acknowledges that it must compare the marks in the context in which a consumer might observe them, but for the same reasons discussed above, the differences between the parties' names in the logos is sufficient to avoid confusing a customer of Plaintiff or Defendant's services.

10

protection to common personal names in part because of a "reluctance to forbid a person from using his or her own name in business" and also because "some names are so common that consumers will not assume that two products bearing the same name have the same source." 2 McCarthy on Trademarks and Unfair Competition § 13:3; *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 989 (7th Cir. 2004). The name "Fischer" is a fairly common name.[9] "Frichtel," meanwhile, is less common, and pairing it with "Fischer" perhaps raises the mark's strength to some extent. But the overall mark remains a combination of surnames, and as such it does not represent a conceptually strong mark. For the reasons discussed in its secondary-meaning analysis, the Court finds that the mark has some *commercial* strength, since Plaintiff has provided evidence of its strong reputation in the St. Louis area as well as its long and continuous use of the "Fischer & Frichtel" trade name. This is enough for the Court to consider the mark of at least moderate strength overall. The "strength of mark" factor is, on the evidence currently before the Court, therefore neutral, and does not tip the scales in Plaintiff's favor given the dissimilarity of the marks and the sophistication of the likely consumer.

The "intent to pass off" factor favors Defendant. Plaintiff pointed out that Defendant was aware of Plaintiff's existence before moving into the St. Louis market but chose to do so anyway. But knowledge alone is insufficient to show that Defendant intended to capitalize on any goodwill Plaintiff has in its alleged trade names. *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) ("Knowledge of another's product and an intent to compete with that product is not . . . equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion." (alteration in original) (quoting *Gen. Mills*, 824 F.3d at 627)); 4 McCarthy on Trademarks and Unfair Competition § 23:120 (providing as the majority rule that "[a]n intent to confuse cannot be

---

[9] Defendant provided examples of hundreds of federal- and state-registered trademarks using the names "Fischer" or "Fisher," which the Court views as strong evidence of the name's commonality. *See* Doc. [26-2].

11

teased out of a business's decision to continue the challenged use after receiving a cease and desist letter"). Moreover, Defendant provided evidence that, like Plaintiff, it is a family-owned business with an excellent, nationwide reputation in its field, making it less likely that Defendant has a need to attempt a free ride on Plaintiff's reputation. *See* Doc. [14-2] ¶ 26. Defendant has used the "Fischer Homes" mark since it was created in 1980 and draws its name from its founders; there is no evidence supporting the conclusion that Defendant hopes to fortuitously use its name to confuse customers into thinking it is actually Plaintiff. Defendant has, in fact, displayed an intent to avoid causing confusion: it agreed to provide a disclaimer of affiliation with Plaintiff in its press releases and also provided a contact person to whom Plaintiff could address any confusion issues. That evidence contradicts any allegation of intent to pass off.

The "competition" factor clearly favors Plaintiff, since it and Defendant appear to occupy very nearly the same competitive marketplace. In a vacuum, this would counsel that confusion is more likely; to be sure, it is probable that the relevant consumer might encounter either or both of Plaintiff and Defendant's names in her search for a new home. But the Court does not conduct its analysis in a vacuum, and, as earlier discussed, on balance the sophistication of the consumers and the lack of similarity between "Fischer Homes" and "Fischer & Frichtel" outweigh any risk of confusion caused by the direct competition between the parties.

Finally, the Court finds that the "evidence of actual confusion" factor is, at best, neutral. To this point, Plaintiff has provided the Court with observations of third parties that Defendant's entry into the market could cause confusion, see Docs. [1-7] at 3; [1-9] at 3, 8–10, as well as some evidence of individuals confusing whether Plaintiff or Defendant purchased Payne Family Homes, see Docs. [1-7] at 4; [1-9] at 6; [27-1] at 2. The Court does not view the observations of the third parties as evidence of actual confusion; those observations merely point out the *possibility* of future

12

confusion. And Plaintiff has provided only a few isolated instances of actual confusion so far (assuming they are examples of the type of confusion contemplated by trademark infringement caselaw). *See First Nat'l Bank*, 153 F.3d at 890 ("Isolated evidence of some actual confusion occurring initially upon the creation of a potentially confusing mark is not itself sufficient to establish a likelihood of confusion."). The Court recognizes that Defendant only recently entered into geographic competition with Plaintiff; it is, of course, possible that Plaintiff may later have more evidence of actual confusion, but that evidence is lacking for the time being. While evidence of actual confusion can be very probative of the likelihood of confusion,[10] there is simply not enough evidence of actual confusion to overcome the weight of the consumer sophistication and dissimilarity of marks here.

In sum, the Court finds that Plaintiff is not likely to show that consumers are likely to confuse Defendant's trade name "Fischer Homes" with Plaintiff's protectible trade name of "Fischer & Frichtel."[11] Only the "competitive proximity" factor favors Plaintiff, while the other factors either decidedly favor Defendant or are neutral. Plaintiff has thus failed to show a likelihood of success on the merits of its trademark infringement or unfair competition claims.

2. *Trademark Dilution*

Plaintiff likewise has not demonstrated a likelihood of success on the merits of its state-law trademark dilution claims. There are issues both with the abstract and factual application of a

---

[10] *See* 4 McCarthy on Trademarks and Unfair Competition § 23:13 ("[E]vidence of actual confusion is strong proof of the fact of a likelihood of confusion."); *David Sherman Corp v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965) (observing that some courts hold that "the best test of proving likelihood of deception is actual deception itself").

[11] Plaintiff's concern about Defendant's entrance into the St. Louis market is understandable, but on the record and evidence before it, the Court cannot grant Plaintiff the extraordinary remedy of a temporary restraining order on the basis of its infringement claims, particularly where Plaintiff is asking the Court to prevent Defendant from using a name it has used consistently since 1980 in connection with its own successful business and also inspired by its founders' surname.

dilution claim to this case. First, in the abstract, claims for trademark dilution are generally intended as a backstop to claims for infringement or unfair competition. *Window World*, 2020 WL 7041814, at *5. Dilution cannot be shown by simply demonstrating likelihood of confusion. This is because dilution claims are generally intended to apply where the marks at issue are identical or very similar, while the goods or services at issue are noncompetitive. 4 McCarthy on Trademarks and Unfair Competition 24:72 (explaining that dilution only applies where "the marks are so similar as to be essentially the same, but the respective goods or services . . . are so different and far-removed that the ordinary buyer is *not* likely to be confused as to source" (emphasis added)). Plaintiff and Defendant engage in nearly identical services and produce nearly identical goods—they are in direct competition with one another. By reference to the purposes underlying dilution claims, then, it does not appear that Plaintiff's case could even theoretically involve dilution.

Second, even assuming the goods were noncompetitive, the evidence before the Court does not suggest Plaintiff is likely to succeed on the merits of either its dilution by blurring or dilution by tarnishment claims. To begin with, there is insufficient evidence at this stage in the litigation that Plaintiff's alleged "Fischer" mark has acquired secondary meaning, and thus there is insufficient evidence that the "Fischer" mark is protectible as a trademark in the first place. *See Sensient Techs.*, 613 F.3d at 769–70 (stating that a plaintiff claiming dilution under Mo. Rev. Stat. § 417.061 "must show its mark or trademark was valid at common law, that its mark is distinctive, and that defendants' use of its name created a likelihood of dilution" (quoting *Cmty. of Christ Copyright Corp. v. Devon Park Restoration*, 683 F. Supp. 2d 1006, 1017 (W.D. Mo. 2010))); *Frosty Treats*, 426 F.3d at 1011. With respect to the "Fischer & Frichtel" mark, as the Court discussed in its likelihood-of-confusion analysis, that mark is not similar to Defendant's "Fischer Homes" mark. That is fatal to Defendant's dilution claims, since dilution requires that the marks

14

at issue be "so similar as to be essentially the same." 4 McCarthy on Trademarks and Unfair Competition § 24:72; *see also Sensient Techs.*, 613 F.3d at 770 (clarifying that "the same dissimilarity" preventing a finding of likelihood of confusion likewise prevents a finding of dilution under Missouri law). And, finally, on the evidence currently before the Court, dilution by tarnishment appears to be entirely unapplicable here. That claim is most often applied where the trademark owner seeks to avoid association with an alleged infringer who provides an explicit or unsavory good or service that might denigrate the owner's reputation. *See Window World*, 2020 WL 7041814, at *6. While Plaintiff argues that tarnishment claims have been permitted in other contexts, the Court will not, on the evidence before it, extend that claim to the facts presented here. Plaintiff argues, in essence, that Defendant's bad reputation will tarnish Plaintiff's good one. But Defendant provided evidence that it has a good, nationwide reputation; it is far from obvious that any affiliation between Plaintiff and Defendant would tarnish Plaintiff's reputation within the meaning of a dilution by tarnishment claim.

Neither the current facts nor law support a dilution claim here, so the Court finds that Plaintiff is not likely to succeed on the merits of its dilution claims.

**B. Irreparable Harm**

While it is certainly possible that Plaintiff will succeed in showing irreparable harm, to this point it has provided the Court with little more than conclusory assertions unwed from arguments based in fact[12] and an assertion that the Court can simply presume irreparable harm if it finds that Plaintiff will likely prove likelihood of confusion. *See* Doc. [4-1] at 14. Setting aside that the Court has not found probable success of showing likelihood of confusion, "[t]he Court does not presume irreparable harm based solely on its finding of likely (or actual) confusion." *JDR Indus.*,

---

[12] At best, the only evidence of potential irreparable harm before the Court is general confusion from third parties who are not obviously consumers of Plaintiff's services.

121 F. Supp. 3d at 891 (citing *Ferring Pharms., Inc. v. Watson Pharms.*, 765 F.3d 205 (3d Cir. 2014) & *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013)); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1117 (N.D. Cal. 2010) (noting that "irreparable harm cannot be presumed—even for trademark actions"). Because a showing of irreparable harm is required before a court provides injunctive relief, Plaintiff's failure to carry its burden on this prong provides an independent basis for denying its request for a TRO. *Grasso Enters, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1039–40 (8th Cir. 2016); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### C. Balance of the Equities and Public Interest

The balance of the equities is, at most, neutral, and may, in fact, slightly tip in Defendant's favor. Plaintiff requests extreme injunctive relief: an order from the Court essentially preventing Defendants from using the name "Fischer" or "Fischer Homes" in connection with Defendant's business in the St. Louis area. *See* Doc. [4-2]. This would create a notable burden on Defendant. If the Court entered the relief Plaintiff seeks, Defendant would have two obvious options: use a different trade name and mark in the St. Louis area than it uses in the many other states in which it operates, or completely rebrand, nationwide. The Court has little doubt that both options would require a significant investment of time and expense, and the first option would deprive Defendant from the benefit of its own name, which Defendant has developed over a period of forty years and which, based on evidence Defendant provided, comes with a good reputation nationwide. *See* Doc. [14-1] at 41. If the Court denies the TRO request, Plaintiff will have to compete with

16

Defendant.  While this may present various challenges, legitimate business competition is not the sort of harm that changes the Court's analysis here, particularly when the Court has found that there is not a likelihood of confusion by Defendant's use of its mark in the St. Louis area.  *See Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987) (noting that "the value [of] free competition" must be weighed in a trademark action); *Furminator, Inc. v. Ontel Prods. Corp.*, 429 F. Supp. 2d 1153, 11 (E.D. Mo. 2006) ("There is a very strong public interest in favor of legitimate competition among goods in the marketplace.").  Even assuming Plaintiff had shown likelihood of confusion, the balance of the equities would be only neutral; as things currently stand, that balance slightly favors denial of the TRO.

Finally, Plaintiff argues the public interest will be served if the Court grants the TRO because it will prevent consumer confusion.  Doc. [4-1] at 21.  Since the Court has found that there is no likelihood of confusion, this argument is unpersuasive.  In fact, there is an argument to be made that granting the TRO would deprive the public of knowing which company it is dealing with if Defendant is forced to rebrand, rather than having the benefit of Defendant's use of its longstanding trade name.  *See Calvin Klein* 815 F.2d at 505 (stating that district courts should consider "the broader economic implications" of granting injunctive relief when weighing the public interest factor).  The public interest favors denial of Plaintiff's TRO request.

## CONCLUSION

Plaintiff has failed to show that it is likely to succeed on the merits of its trademark infringement, unfair competition, or dilution claims.  On the evidence before the Court, Plaintiff's alleged "Fischer" mark lacks the requisite distinctiveness to garner protection under trademark law.  Though there is sufficient evidence showing that Plaintiff's "Fischer & Frichtel" mark has acquired secondary meaning, and is thus protectible, the Court finds that there is no likelihood of

confusion. The relevant consumers of Plaintiff and Defendant's goods and services are likely to be particularly sophisticated, and in light of that sophistication, the "Fischer & Frichtel" mark is not very similar to Defendant's "Fischer Homes" mark. Furthermore, there is no indication Defendant has any intent to pass off its good or services as Plaintiff's, and the "Fischer & Fritchtel" mark is of no more than moderate strength; there is insufficient evidence of actual confusion to overcome the weight of the other *SquirtCo* factors. And Plaintiff's claims for dilution appear inapt based on the evidence currently before the Court. Plaintiff has also failed to demonstrate, beyond conclusory arguments, that it will suffer irreparable harm in the absence of injunctive relief. Finally, both the balance of the equities and the public interest favor denial of Plaintiff's request for the extraordinary relief of a TRO.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, Doc. [4], is **DENIED.**

Dated this 4th day of May, 2021.

---

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE